LEXSEE 2002 U.S. DIST. LEXIS 4908



Cited
As of: Apr 13, 2008

**JAMES F. JACKSON, Plaintiff, v. LOCAL 705, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AFL-CIO, et al., Defendants.**

**Case No. 95 C 7510**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2002 U.S. Dist. LEXIS 4908*

**March 22, 2002, Decided**

**DISPOSITION:**   [*1] Defendants' motion for summary judgment granted in part and denied in part.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN1] In accordance with the summary judgment standard, a court views the facts in the light most favorable to the non-movant.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN2] In general, a Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e et seq.*, plaintiff may not bring claims in a lawsuit that were not included in his Equal Employment Opportunity Commission (EEOC) charge. This rule serves two purposes: (1) permitting the EEOC to investigate claims, so that there will be an opportunity before the plaintiff files suit to settle the dispute through conference, conciliation and persuasion; and (2) giving the employer some warning of the conduct about which the employee is aggrieved. Nevertheless, a Title VII plaintiff need not allege in his EEOC charge each and every fact underlying each claim in his complaint. Rather, all claims set forth in a complaint are cognizable that are like or reasonably related to the allegations of the charge and can reasonably be expected to grow out of such allegations. The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions.

*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN3] It is very helpful if citations to facts in the memorandum are to both the U.S. Dist. Ct., N.D. Ill., R. 56.1(a)(1) documents establishing the fact and to the U.S. Dist. Ct., N.D. Ill., R. 56.1(a)(3) statement.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Harassing Conduct*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN4] Allegations of discrimination outside the body of the Equal Employment Opportunity Commission charge may be considered when it is clear that the charging party intended the agency to investigate those allegations.

Case 1:08-cv-00549   Document 13-5   Filed 04/14/2008   Page 2 of 20

Page 2
2002 U.S. Dist. LEXIS 4908, *1

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN5] A claim orally communicated to the Equal Employment Opportunity Commission, but omitted through the agency's fault cannot, simply on that account, be treated as if properly filed.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN6] Conditioning a plaintiff's right to recover on the omissions of other parties would unduly undermine the remedial purposes of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > General Overview*
[HN7] Allegations outside the Equal Employment Opportunity Commission charge may be considered when the charging party intended the agency to investigate those allegations, but the allegations must be written.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Defenses*
*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Employment Practices > Demotions & Promotions*
*Labor & Employment Law > Discrimination > Racial Discrimination > Defenses & Exceptions > General Overview*
[HN8] The Faragher-Ellerth affirmative defense is not available when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Evidence > Procedural Considerations > Preliminary Questions > General Overview*
[HN9] A proper foundation for a conversation must include information as to when and where the conversation occurred, who was present, and who said what to whom.

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN10] To establish a genuine issue of material fact, the nonmovant on summary judgment must produce admissible evidence.

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*
[HN11] No rule of evidence requires a foundation; "foundation" is simply a loose term for preliminary questions designed to establish that evidence is admissible. At trial, it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place and between the witness and someone else before the witness is permitted to testify to the conversation's content.

*Evidence > Relevance > Relevant Evidence*
[HN12] Evidence is relevant if it bears on the existence of any fact of consequence to the determination of the action. *Fed. R. Evid. 401*.

*Civil Procedure > Discovery > Methods > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN13] Sworn interrogatory answers may be considered in conjunction with summary judgment motion only if the person answering the interrogatory had personal knowledge or was competent to testify as to the matters stated.

*Labor & Employment Law > Discrimination > Retaliation > General Overview*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN14] Absent direct evidence of retaliation, a plaintiff must show that (1) he engaged in activity protected under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq*,; (2) he suffered an adverse employment action; and (3) a causal connection exists between the adverse action and his participation in the protected activity.

*Labor & Employment Law > Discrimination >*

Case 1:08-cv-00549   Document 13-5   Filed 04/14/2008   Page 3 of 20

Page 3
2002 U.S. Dist. LEXIS 4908, *1

*Retaliation > General Overview*
[HN15] On a claim for retaliation, denial of a raise and denial of a promotion each constitutes an adverse employment action.

*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
[HN16] Systematic exclusion from meetings can meet the adverse employment action standard under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > General Overview*
*Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
[HN17] See *42 U.S.C.S. § 1981*.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > General Overview*
*Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
[HN18] *42 U.S.C.S.§ 1981(b)* defines the term "make and enforce contracts" to include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > Public Policy*
*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN19] Illinois law does not permit the termination of an at-will employee for a reason that violates public policy.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Liable Parties*
*Labor & Employment Law > Discrimination > Reconstruction Statutes (secs. 1981, 1983 & 1985)*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*

[HN20] An employee's at-will employment status does not bar a *42 U.S.C.S. § 1981* discriminatory termination claim.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Liable Parties*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Remedies*
[HN21] Personal liability under *42 U.S.C.S. § 1981* must be predicated on the actor's personal involvement. However, the element of personal involvement may be satisfied by proof that a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them.

*Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview*
*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy*
[HN22] District courts have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. *28 U.S.C.S. § 1367(a)*. The state and federal claims must derive from a common nucleus of operative fact. A loose factual connection between the claims is generally sufficient.

*Torts > Intentional Torts > Defamation > Defamation Per Se*
[HN23] Among the types of per se defamation are: (1) words which impute inability to perform or want of integrity in the discharge of duties of office or employment; and (2) words which prejudice a particular party in his profession.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Intentional Torts > Defamation > Defenses > Statutes of Limitations*
[HN24] Illinois law provides a one-year statute of

Case 1:08-cv-00549   Document 13-5   Filed 04/14/2008   Page 4 of 20

Page 4
2002 U.S. Dist. LEXIS 4908, *1

limitations for defamation actions. *735 Ill. Comp. Stat. 5/13-201*.

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Intentional Torts > Defamation > Defenses > Statutes of Limitations*
[HN25] In a defamation case, where the statute of limitations is involved, alleging publication "on or about" or "subsequent to" a specific date, without accompanying details or information, is not enough.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Simple Offenses > Elements*
*Torts > Intentional Torts > Assault & Battery > Elements of Assault*
[HN26] Illinois law defines a civil assault as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Simple Offenses > Elements*
*Torts > Intentional Torts > Assault & Battery > General Overview*
[HN27] Words alone can sometimes suffice to establish a case for civil assault, even without an accompanying threatening gesture.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Scope of Authority*
*Torts > Vicarious Liability > Employers > General Overview*
[HN28] Under Illinois law, the conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents >*

*Liability of Principals*
*Civil Procedure > Judicial Officers > General Overview*
*Torts > Vicarious Liability > General Overview*
[HN29] The master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the earlier act. Illinois courts have held that the employer may be liable where the employee acts with the dual purpose of furthering the employer's interests and venting personal anger. It is sufficient if the employee's actions were prompted only in part by a purpose to protect the employer's property or further the employer's business.

*Labor & Employment Law > Discrimination > Racial Discrimination > Federal & State Interrelationships*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Defenses*
*Torts > Procedure > Preemption > General Overview*
[HN30] Whether a common law claim is so displaced depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Illinois Human Rights Act (IHRA), *775 Ill. Comp. Stat. 5/8-111(C)*. It does not matter that the conduct giving rise to the tort claim could also support an IHRA claim. The IHRA is not intended to preempt all tort claims arising out of actions it prohibits. Rather, the critical question is whether the plaintiff can establish the necessary elements of the tort independent of any legal duties created by the IHRA.

*Civil Procedure > Jurisdiction > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Memoranda of Law*
[HN31] A summary judgment argument not raised until a reply brief is waived.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Simple Offenses > General Overview*
*Torts > Intentional Torts > Assault & Battery > General Overview*
[HN32] A common law assault claim is not preempted by the Illinois Human Rights Act, *775 Ill. Comp. Stat.*

Case 1:08-cv-00549   Document 13-5   Filed 04/14/2008   Page 5 of 20

Page 5
2002 U.S. Dist. LEXIS 4908, *1

5/8-111(C).

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN33] In Illinois, a plaintiff establishes a claim for intentional infliction of emotional distress by showing that: (1) the conduct involved was truly extreme and outrageous, (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct in fact caused severe emotional distress. The extreme and outrageous character of the conduct can arise from the abuse of a position of power. An employer's abuse of authority over an employer can qualify. The particular sensitivity of the plaintiff is also a relevant factor. Behavior, which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable, may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.

*Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Employee Burdens*
*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN34] Since the elements of intentional infliction of emotional distress are quite different from those necessary to establish a civil rights violation under the Illinois Human Rights Act (IHRA), *775 Ill. Comp. Stat. 5/8-111(C)*, the IHRA does not preempt such a cause of action.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements*
[HN35] In the employment context, when the defendant has some degree of power over the plaintiff, the severity of the conduct that plaintiff need allege to establish an intentional infliction of emotional distress claim decreases as the defendant's level of control increases.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN36] On an intentional infliction of emotional distress claim, the outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case.

*Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview*
[HN37] The question on an intentional infliction of emotional distress claim is whether the distress inflicted is so severe that no reasonable man could be expected to endure it.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against Persons > Assault & Battery > Simple Offenses > Elements*
*Torts > Intentional Torts > Assault & Battery > General Overview*
*Torts > Vicarious Liability > Employers*
[HN38] It would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business.

*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Authorized Acts of Agents > Liability of Principal*
*Business & Corporate Law > Agency Relationships > Duties & Liabilities > Negligent Acts of Agents > Liability of Principals*
*Torts > Vicarious Liability > Employers*
[HN39] A principal also may be liable for the torts of his servants acting outside the scope of their employment if the servant was aided in accomplishing the tort by the existence of the agency relation. For Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq*, purposes, the fact that harassment by a supervisor culminated in a tangible employment action raises a nonrebuttable presumption that the employment relationship aided the harassment.

*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Proof of Discrimination*
*Civil Rights Law > Contractual Relations & Housing > Equal Rights Under the Law (sec. 1981) > Remedies*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Remedies > Mitigation of Damages*
[HN40] Under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq*, and *42 U.S.C.S.§ 1981*, a defendant can show that the plaintiff failed to mitigate damages by demonstrating that the plaintiff was not reasonably diligent in seeking other employment and that there was a reasonable chance that plaintiff might have

found a comparable position.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Labor & Employment Law > Discrimination > Racial Discrimination > Remedies > General Overview*

[HN41] The issue of mitigation of damages is a question of fact for the jury.

**COUNSEL:** JAMES F JACKSON, plaintiff, Pro se, Chicago, IL.

For JAMES F JACKSON, plaintiff: Monica Elisabeth McFadden, McFadden Law Offices, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), defendant: Melissa J. Auerbach, Cornfield & Feldman, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), defendant: Thomas R. Carpenter, Chicago, IL.

For LOCAL 705 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, (AFL - CIO), GERALD ZERO, JOHN MCCORMICK, JO PRESSLER, defendants: Robert A. Seltzer, Cornfield & Feldman, Chicago, IL.

**JUDGES:** JOAN B. GOTTSCHALL, United States District Judge.

**OPINION BY:** JOAN B. GOTTSCHALL

**OPINION**

**MEMORANDUM OPINION AND ORDER**

Plaintiff James F. Jackson pursues this federal discrimination and state tort action against four defendants: Local 705, International Brotherhood of Teamsters, AFL-CIO ("Local 705") and three of its officers and trustee staff members, Jo Pressler, John McCormick, and Gerald Zero. The defendants move for summary judgment on all claims. For the reasons outlined below, the motion is granted in part and denied in part.

**I. Background**

[HN1] In [*2] accordance with the summary judgment standard, the court views the facts in the light most favorable to the non-movant Jackson. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Because the defendants move to strike much of the critical evidence, discussion of facts based on that evidence is reserved for the analysis section. Still, a brief overview will help to situate the case.

Jackson, an African-American man, worked for Local 705 as a business representative from 1989 to September 23, 1994. During this time, he claims to have been the subject of extensive and intensifying offensive conduct by Zero, McCormick, and, to a lesser degree, Pressler. A few examples illustrate. Upon Jackson's return from a commemoration of the March on Washington, Zero told Jackson that Martin Luther King, Jr. was an "uppity black ass nigger" who should have been assassinated long before he was. (Rule 56.1(a)(3) Statement P 123.) In July or August of 1994, Zero told Jackson that Emmett Till should have been killed for whistling at a white woman and that all blacks who behave like him should be killed. (*Id.* P 129.) Jackson observed McCormick [*3] showing a newspaper photograph of a slain Till to people and heard McCormick use the word "nigger" on several occasions. (*Id.* P 130.) Jackson once overheard Pressler in her office telling another person that African-Americans had small brains, were dumb, and had less knowledge than white people. (*Id.* P 124.) The defendants deny all of these allegations, but do not dispute them for purposes of summary judgment.

On September 23, 1994, Jackson was fired. He filed EEOC charges on October 14, 1994, alleging discriminatory discharge. Jackson's EEOC intake questionnaire also included a reference to "constant negative remarks toward Italian-American and Blacks." (Defs.' Ex. K, Tab 17, at 1451.) Within 30 days of receiving a right to sue letter from the EEOC, Jackson filed his initial complaint in this matter alleging unlawful termination. His first amended complaint, filed on May 15, 1996, added claims against the individual defendants for, *inter alia*, defamation, intentional infliction of emotional distress ("IIED"), and assault, as well as respondeat superior against Local 705. The second amended complaint includes seven counts: (1) Title VII of the Civil Rights Act of 1964 [*4] ("Title VII"), *42 U.S.C. § 2000e et seq.*, claims against Local 705; (2) Age Discrimination in Employment Act of 1967 ("ADEA"),

*29 U.S.C. § 621 et seq.*, claims against Local 705; (3) Civil Rights Act of 1866, *42 U.S.C. § 1981*, claims against all four defendants; (4) defamation claims against all four defendants; (5) IIED claims against all four defendants; (6) assault claims against Zero, McCormick, and Pressler; and (7) respondeat superior claims against Local 705.

## II. Analysis

A. Count I: Title VII Claims Against Local 705

Jackson raises three different Title VII theories: (1) racial harassment and hostile work environment; (2) discriminatory discharge; and (3) retaliation. [1]

> 1   The complaint raised a fourth theory of recovery: exclusion or attempted exclusion from union membership. Jackson has voluntarily withdrawn this claim. (Pl.'s Resp. Mem. 53.)

1. *Racial Harassment/Hostile Work Environment*

[HN2] In general, [*5] a Title VII plaintiff may not bring claims in a lawsuit that were not included in his EEOC charge. *Cheek v. W. & S. Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)*. This rule serves two purposes: (1) permitting the EEOC to investigate claims, so that there will be an opportunity before the plaintiff files suit "to settle the dispute through conference, conciliation and persuasion"; and (2) giving the employer "some warning of the conduct about which the employee is aggrieved." *Id.* Nevertheless, a Title VII plaintiff need not allege in his EEOC charge each and every fact underlying each claim in his complaint. *Id.* Rather, all claims set forth in a complaint are cognizable that are "like or reasonably related to the allegations of the charge" and can reasonably be expected to grow out of such allegations. *Id.* (quoting *Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976)* (en banc) (citation omitted)). "The standard is a liberal one in order to effectuate the remedial purposes of Title VII, which itself depends on lay persons, often unschooled, to enforce its provisions." *Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir. 1985)*. [*6]

Local 705 argues that Jackson cannot raise a claim of racial harassment and hostile work environment because his EEOC charge is devoid of any facts relating to such a claim. Indeed, Jackson's one-page EEOC charge form is limited to his September 23, 1994 termination. However, Jackson urges the court to look outside the four corners of the charge--most notably, to consider his intake questionnaire, which alleges "constant negative remarks toward Italian-American and Blacks." (Defs.' Ex. K, Tab 17, at 1451.) Jackson also points to a memorandum he gave to the EEOC representative in which Pressler tells Zero and McCormick to stop using words like "niggers, animals and boys" because doing so could cause them to lose an upcoming election. (Defs.' Ex. K, Tab. 17, at 1453.) An EEOC representative prepared both the intake questionnaire and the charge form. [2] (Pl.'s Ex. 2, PP 7, 15, 16.) Jackson claims that, in response to his specific request, the EEOC representative assured him that the agency would investigate *both* his termination and the negative racial environment and that he signed the charge form only after the representative told him that the charge would encompass his complaints [*7] about negative racial comments. (*Id.* PP 12, 17, 18.) The intake questionnaire indicates that Jackson had not sought assistance from an attorney and there is no suggestion in the record that he did so before signing the charge form two days later. Indeed, Jackson filed his initial complaint in this action *pro se*.

> 2   To find this affidavit, the court went through Jackson's response to Local 705's statement of undisputed fact number 10. Local 705 has moved to strike this response for failure to comply with this court's standing order regarding motions for summary judgment. The court need not decide the merits of the motion to strike because granting it would not affect the court's analysis. Local 705 would have the court accept as undisputed its assertion that "Jackson filed [EEOC] charges . . . alleging discrimination . . . in connection with his termination from employment." The court would not be required to assume that Jackson charged discrimination *only* in respect to this event. That Jackson's responsive statement would be stricken for substantive purposes would not prohibit the court from relying on it as an index to referenced exhibits. *Cf.* Standing Order Regarding Mots. for Summ. J. of 10/14/99 [HN3] ("It is very helpful if citations to facts in the memorandum are to both the 56.1(a)(1) documents establishing the fact and to the 56.1(a)(3) statement.").

[*8] Accepting Jackson's sworn testimony as true, as the court must at this stage of the proceedings, it is clear that the EEOC dropped the ball by not including

racial harassment in the formal charge. The question is whether the EEOC's mistake should preclude Jackson from suing for harassment. In light of Jackson's *pro se* status, the reference in the questionnaire to "constant negative comments" about blacks, the memorandum suggesting routine use of words like "niggers, animals and boys," the erroneous statements made by the EEOC representative, and the remedial purposes of Title VII, the answer must be no. The intake questionnaire and memorandum may be considered because Jackson clearly intended the EEOC to investigate racist comments in his workplace. *See Cheek, 31 F.3d at 502* [HN4] ("Allegations outside the body of the charge may be considered when it is clear that the charging party intended the agency to investigate those allegations."). The questionnaire and memorandum indicate that, at a minimum, Jackson brought the remarks to the attention of the EEOC. And a claim of racial harassment "can reasonably be expected to grow out of an EEOC investigation" of these allegations. [*9] *Id. at 500*. If there were no written record of the comments, Jackson might be out of luck. *See Vela v. Village of Sauk Village, 218 F.3d 661, 665 n.2 (7th Cir. 2000)* [HN5] ("We would not agree . . . that a claim orally communicated to the agency, but omitted through the latter's fault could, simply on that account, be treated as if properly filed."). So too the written references, standing alone, might not suffice. But the combination of the writings and Jackson's description of the interview suggests that he did everything he could reasonably be expected to do to preserve his racial harassment claim. On these facts, the errors of an EEOC representative will not bar Jackson's claim. *See Babrocky, 773 F.2d at 864 n.2* [HN6] ("Conditioning a plaintiff's right to recover on the omissions of other parties would unduly undermine the remedial purposes of Title VII.").

Courts in this district have reached the same result, sometimes on less compelling facts. See, e.g., *Finley v. Illinois Dep't of Public Aid, 1998 U.S. Dist. LEXIS 474*, at *11-16, No. 97 C 3381 (N.D. Ill. Jan. 9, 1998) (essentially identical facts); [*10] *Horwitz v. Sterling Miami, Inc., 1998 U.S. Dist. LEXIS 7184*, at *7-9, No. 97 C 6322 (N.D. Ill. Apr. 28, 1998) (same, except no mention of *pro se* status, who prepared the charge, or any misrepresentation by the EEOC representative). Although it reached the same result, the court in *Sickinger v. Mega Sys., Inc., 951 F. Supp. 153, 158 (N.D. Ind. 1996)*, relied on the fact that the employer could not claim prejudice or surprise upon discovering a discriminatory discharge claim where the employee had filed her EEOC charge, which alleged only sexual harassment, just eight days after being terminated. The timing put the employer on constructive notice of the termination claim, the court reasoned.

Jackson's racial harassment claim was certainly less obvious than the claim in *Sickinger*. Indeed, Jackson concedes that Local 705 did not receive notice of the claim. But that fact, standing alone, is not dispositive under Seventh Circuit case law. In *Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir. 1992)*, "the actual typewritten charge plaintiff filed with the EEOC . . . only made reference to her termination and to her belief that she had been discriminated [*11] against because of her race." However, the plaintiff also submitted a separate "affidavit" that included an explicit reference to the defendant's allegedly discriminatory promotion policies. *Id. at 1110-11*. Applying a standard of "utmost liberality" and relying on the affidavit, the Seventh Circuit held that the plaintiff's denial of promotion claim was properly preserved. *Id. at 1111*. Indeed, the court of appeals went further than the district court and held that two derivative claims, not expressly mentioned in the affidavit, were also preserved. *Id.*

*Box v. A & P Tea Co., 772 F.2d 1372, 1375 (7th Cir. 1985)*, is similar. There, the typed charge discussed race discrimination but made no suggestion of a sex discrimination claim. In rejecting the defendant's motion for summary judgment on the sex discrimination claim, the court relied in part on a statement in the plaintiff's "EEOC questionnaire that she was not promoted because she was black and because she was a female." *Id.* Both *Rush* and *Box* relied on statements made outside the formal charge without even discussing the fact that the defendant was not entitled to [*12] service of these materials. These cases do not undermine the goal of notice to the employer because, in the usual case, a competent EEOC investigation will inform the employer of claims that were made to the EEOC but erroneously omitted from the formal charge. *See Cheek, 31 F.3d at 505* ("The investigation . . . would have put [the employer] on notice that [the plaintiff] was claiming that [a supervisor] had sexually harassed her.").

Two recent Seventh Circuit decisions focus on the goal of employer notice, but neither impacts the case at bar. In *Novitsky v. Am. Consulting Eng'rs, L.L.C., 196 F.3d 699 (7th Cir. 1999)*, the court affirmed the entry of

summary judgment against a plaintiff whose EEOC charge failed to include the critical incident of discrimination, even though the incident was mentioned in her intake questionnaire. Some language in that opinion can be read to imply that a court may never look outside the four corners of an EEOC charge, but that language must be read in context. The panel expressly distinguished the case "in which the EEOC refused to accept a charge, or told someone that an intake questionnaire and a charge are the [*13] same thing." *Id. at 702*. That is precisely what Jackson says happened. But Jackson's case is even stronger than the *Novitsky* hypothetical because Jackson, unlike the plaintiff in that case, was not assisted by counsel when he signed the EEOC charge. As the concurring judge explained:

> We do not now decide whether an illiterate or *pro se* person who signs a charge prepared by the EEOC, which leaves out critical information provided by the claimant to the EEOC in the intake questionnaire, would be similarly bound by the charge. That issue is not before us and is in fact substantially different from the one we decide today. A number of courts have recognized that equitable considerations may require a court to look outside the formal charge where the employee has done all that she can to present the claim to the EEOC, particularly where the failure to include the allegations results from EEOC negligence or misinformation.

*Id. at 703* (Rovner, J., concurring).

More recently, the Seventh Circuit rejected a plaintiff's attempt to rely on oral representations made to the EEOC representative but omitted from the formal charge. *Vela v. Village of Sauk Village, 218 F.3d 661 (7th Cir. 2000)*. [*14] Citing *Cheek, Rush*, and *Box*, the court reaffirmed the general principle that [HN7] allegations outside the charge may be considered when the charging party intended the agency to investigate those allegations, but added the limitation that the allegations must be written. *Vela, 218 F.3d at 664*. Presumably, the court was concerned that some Title VII plaintiffs would be unable to resist the temptation to prevaricate regarding what was said in conversations with the EEOC and wanted some contemporaneous documentation to minimize this potential. One court in this district has interpreted *Vela* to foreclose reliance on even written materials outside the charge and questionnaire, but the court noted that the plaintiff there had not claimed that the EEOC intake representative had misled her. *Dillon v. M.S. Carriers, Inc., 2000 U.S. Dist. LEXIS 11778, at *27, No. 98 cv 2012 (N.D. Ill. Aug. 9, 2000)*.

Local 705's reliance on *Park v. Howard University, 315 U.S. App. D.C. 196, 71 F.3d 904 (D.C. Cir. 1995)*, is misplaced. There was no evidence in *Park* that the EEOC (let alone the employer) ever had access to the relevant questionnaire. [*15] *71 F.3d at 909*. In any event, this court cannot favor precedent from another circuit over the Seventh Circuit case law summarized above.

Local 705 has an even more porous second line of defense to the harassment claim. It argues that it cannot be held vicariously liable because the undisputed facts show "(a) that [it] exercised reasonable care to prevent and correct any . . . harassing behavior, and (b) that [Jackson] unreasonably failed to take advantage of any preventative or corrective opportunities provided by [Local 705] or to avoid harm otherwise." *Faragher v. City of Boca Raton, 524 U.S. 775, 807, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*; *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)*. The parties waste a great deal of effort arguing over whether Local 705's failure to plead this defense amounted to waiver. The more basic problem for Local 705 is that [HN8] this affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." [3] *Faragher, 524 U.S. at 808*; *Ellerth, 524 U.S. at 765*. [*16] In the case at bar, the alleged racial harassment culminated in Jackson's termination. From that moment on, the *Faragher-Ellerth* defense was never available to Local 705. [4] *See Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000)* (squarely holding that this defense was not available because harassment culminated in tangible employment action).

> 3   For an explanation of the rationale behind this principle, *see infra* note 15.
> 4   The court therefore denies as moot Jackson's motion to strike the sections of Local 705's reply memorandum that discuss the *Faragher-Ellerth* defense.

2. *Discriminatory Discharge*

The court also rejects Local 705's motion for summary judgment on the termination claim. Local 705 contends that Jackson does not have direct evidence of discriminatory discharge because several alleged statements by Zero, who Local 705 concedes was the decision-maker regarding Jackson's discharge, are not sufficiently linked to Jackson's termination. *See, e.g., McCarthy v. Kemper Life Ins. Cos., 924 F.2d 683, 686-87 (7th Cir. 1991)* [*17] (requiring that racially-motivated remarks be "related to the employment decision in question"). Notably absent from Local 705's list of statements attributed to Zero is the following:

> Rev Jackson is the next to go. We'll get rid of that nigger. He can kiss all the ass he wants. We're going to use and abuse him and get everything we can out of him. Then we're going to get rid of him. I have no use for niggers.

(Pl.'s Ex. 6, P 8.) According to Mary Mariani, Zero made this statement in the presence of Pressler and McCormick in July or August of 1994. Jackson was terminated on September 23, 1994. It is hard to imagine more direct evidence of discriminatory discharge.

The defendants object to the Mariani affidavit on two grounds, neither of which withstands scrutiny. First, the defendants note that "Mariani's statement fails to identify where [the] conversation occurred, where affiant Mariani was in relation to Zero, Pressler and McCormick, and whether anything else was said." (Defs.' Mot. to Strike at 8.) The result of these deficiencies, the defendants urge, is inadmissibility for lack of an adequate foundation. See [*18] *Jones v. Fed. Home Loan Mortgage Corp., 1999 U.S. Dist. LEXIS 20787,* at *19, No. 93 C 5448 (N.D. Ill. Jan. 3, 2000) [HN9] ("A proper foundation for a conversation must include information as to when and where the conversation occurred, who was present, and who said what to whom."). It is true that [HN10] to establish a genuine issue of material fact the nonmovant on summary judgment must produce *admissible* evidence. *See Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir. 1994).* But recent Seventh Circuit case law makes clear that

> [HN11] no rule of evidence requires a "foundation"; "foundation" is simply a loose term for preliminary questions designed to establish that evidence is admissible. At trial, it is sometimes considered an orderly procedure to produce testimony that a conversation occurred at a particular time and place and between the witness and someone else before the witness is permitted to testify to the conversation's content. The Federal Rules of Evidence provide that relevant evidence is generally admissible, and McPherson does not contend that Holsworth's testimony is irrelevant. We find no reason -- relevance or otherwise -- why the testimony should be excluded. Though Holsworth's testimony [*19] regarding the identity of the A.I. Credit representative and the date of the conversation was inexact, it was specific enough to demonstrate the conversation's occurrence and relevance.

*A.I. Credit Corp. v. Legion Ins. Co., 265 F.3d 630, 637-38 (7th Cir. 2001)* (citations omitted). By like token, the information provided in Mariani's affidavit is specific enough to establish relevance. *See Fed. R. Evid. 401* [HN12] (evidence is relevant if it bears on the existence of any fact of consequence to the determination of the action). Mariani identifies the parties to the conversation, a two-month period in which the conversation took place, the speaker, and an exact quotation of what was said. Omitting the location, like failing to pinpoint the speaker and date in *A.I. Credit*, does not render the statement inadmissible. The defendants cite no authority in support of the proposition that an affiant must describe her relative position in order to establish a foundation for what she claims to have seen and heard. Nor do the defendants explain the relevance of "whether anything else was said," let alone why this omission should render Mariani's statement inadmissible.

[*20] The defendants' second objection is that Jackson should be barred from introducing Mariani's statement because he did not specifically disclose it in response to an interrogatory. On January 14, 1999, the defendants served an interrogatory asking Jackson to identify the date of and witness to each racial epithet and demeaning language allegedly used by Zero. Jackson objected to this interrogatory for several reasons, including its implicit presumption that Jackson had personal knowledge concerning each of Zero's racist statements. Without waiving this objection, Jackson

directed the defendants to a list of witnesses including Mariani. Nothing in Mariani's affidavit or elsewhere in the summary judgment record suggests that Jackson was present when the alleged conversation took place. This court will not prohibit Jackson from introducing evidence that he failed to include in an answer to an interrogatory because it was not within his personal knowledge. Indeed, such an answer itself would have been improper. *See Bank of Illinois v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1166 (7th Cir. 1996)* [HN13] ("Sworn interrogatory answers may be considered in conjunction with [*21] summary judgment motion only if the person answering the interrogatory had personal knowledge or was competent to testify as to the matters stated.").

3. *Retaliation*

[HN14] Absent direct evidence of retaliation, a plaintiff "must show that (1) he engaged in activity protected under Title VII; (2) he suffered an adverse employment action; and (3) a causal connection exists between the adverse action and his participation in the protected activity." *Hill v. Am. Gen. Fin., Inc., 218 F.3d 639, 645 (7th Cir. 2000)*. Local 705 wisely concedes the first element--in addition to filing his EEOC charge, Jackson demonstrated publicly and complained to the national union--but argues that Jackson has failed to establish a dispute of fact on the second and third. The adverse employment action cited by Jackson is the failure of Joint Council 25 to turn the chaplaincy held by him into a full-time paid position. [HN15] Denial of a raise and denial of a promotion each constitutes an adverse employment action. *See Hunt v. City of Markham, 219 F.3d 649, 654-55 (7th Cir. 2000)* (raise); *Ribando v. United Airlines, Inc., 200 F.3d 507, 511 (7th Cir. 1999)* (promotion). [*22]

Local 705's most serious arguments are directed toward causation. William Hogan, the presiding officer of Teamsters Joint Council 25, states in an affidavit that he was unable to achieve his goal of making the chaplaincy a full-time paying position due to the hostility and opposition of Zero and McCormick. (Pl.'s Ex. 23, P 65.) Local 705 argues that this paragraph must be stricken for lack of foundation. This argument fails. The rest of Hogan's affidavit, even omitting the other paragraphs to which Local 705 objects, and reasonable inferences drawn therefrom establish a sufficient foundation for this statement. On the hostility point, Hogan describes a Joint Council 25 meeting in which Zero and McCormick made clear their opposition to Jackson and their retaliatory motives. (*Id.* PP 62, 63) Zero's behavior was so disruptive that the meeting was relocated out of the Local 705 hall. (*Id.* PP 31-51.) From Hogan's statement that he had the authority to create the chaplain position, (*id.* P 18), Local 705 would have the court infer that Hogan could unilaterally add full-time status and a salary. But this inference is belied by Hogan's statement that he "began to take the political [*23] steps necessary to make the position a full-time paying position." (*Id.* P 26.) It is true that Hogan does not outline those steps nor explain why he believes that Zero's and McCormick's retaliatory opposition to Jackson was critical to the chaplaincy remaining part-time and unpaid, but Hogan was well-positioned to form such a belief as a witness to the aborted meeting, as the chief proponent of the raise and promotion, and as the presiding officer of Joint Council 25. No more foundation is required.

As a fallback, Local 705 argues that Hogan's "goal" of making the chaplaincy a paid position is too speculative to support the conclusion that Jackson suffered an adverse employment action. The goal was not so speculative as Local 705 makes out. Hogan states that he intended "within a short period of time" to make the position full-time and paid. (*Id.* P 20.) Hogan may have required approval from other decision-makers (perhaps even Zero and McCormick) in order to execute his plan, but it is reasonable to suppose that, as the presiding officer of the organization, Hogan's proposals had a decent chance of being adopted. Jackson has alleged more than his own belief in the possibility [*24] of securing the raise and promotion. *Cf. Aquilino v. Univ. of Kansas, 268 F.3d 930, 936 (10th Cir. 2001)* ("[The plaintiff]'s alternative-career-path theory rests on little more than her own, untested belief . . . ."). The presiding officer of the relevant decision-making body says that Jackson suffered an adverse employment action as a result of Zero's and McCormick's retaliatory opposition. This creates a genuine dispute of fact.

Despite his termination, Jackson remained a member of Local 705 until May 30, 1995. Jackson alleges retaliatory interference with his rights as a union member--specifically, his right to participate and speak as a chaplain at the March 14, 1995 meeting of Joint Council 25 (described above) and at a May 1995 meeting of the Local 705 retirees club. [5] After his termination from Local 705, Jackson served as an unpaid chaplain for three entities: Joint Council 25, the Local 705 retirees

club, and the Teamsters Black Caucus. (Defs.' Rule 56.1(a)(3) Statement P 159.) Even assuming that these unpaid positions qualified as employment for purposes of Title VII, Jackson has not produced evidence to show that the interference by Local 705's agents, [*25] apart from the alleged impact on Jackson's promotion and raise prospects, materially affected the "terms or conditions" of his employment. *King v. Bd. of Regents of Univ. of Wisconsin Sys., 898 F.2d 533, 537 (7th Cir. 1990)*. It is undisputed that Jackson was never terminated from these positions. (Defs.' Rule 56.1(a)(3) Statement P 159.) Jackson provides no evidence to show that he was unable to participate in the March Joint Council meeting. In fact, the meeting was moved to an alternate venue as a result of Zero's disruptive behavior. On the other hand, it is undisputed for summary judgment purposes that McCormick excluded Jackson from the May retirees club meeting for retaliatory reasons. (Pl.'s Rule 56.1(b)(3) Statement PP 355, 356.) The question is whether this one-time exclusion constituted an "adverse employment action" for Title VII purposes. [HN16] Systematic exclusion from meetings can meet this standard, *Johnson v. City of Fort Wayne, 91 F.3d 922, 932-33 (7th Cir. 1996)*, but the exclusion here from just one meeting cannot be said to have materially altered the terms or conditions of Jackson's chaplaincy. The court therefore grants summary judgment [*26] in favor of Local 705 on this theory of recovery.

> 5   Because Jackson seeks recovery only under federal law, the court expresses no view as to whether he might have a claim for retaliation under the International Brotherhood of Teamsters Constitution.

B. Count III: *Section 1981* Claims Against All Defendants [6]

> 6   The careful reader will notice that the analysis skips from Count I to Count III. This is because Jackson voluntarily withdraws Count II, his ADEA claims.

The defendants argue that Jackson cannot bring a claim under *42 U.S.C. § 1981* because he was an at-will employee of Local 705. [HN17] *Section 1981(a)* provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." [*27] [HN18] *See also id. § 1981(b)* (defining the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"). Because an employer is generally free to terminate an at-will employee for any reason or no reason at all, the argument goes, an at-will relationship is not really a contract with respect to duration. Dicta in one opinion suggests that the Seventh Circuit might accept this argument. *See Gonzalez v. Ingersoll Milling Mach. Co., 133 F.3d 1025, 1035 (7th Cir. 1998)*. As a preliminary matter, it is worth noting that the *Gonzales* dicta applies only to Jackson's termination claim, not to his claims of harassment and retaliation. But the problem for the defendants is more fundamental.

This court does not believe that the Seventh Circuit would adopt the *Gonzales* dicta if squarely presented with the question of whether termination of an at-will employment relationship can support a *section 1981* claim. Every other court of appeals to consider the question has come out the other way. *See Skinner v. Maritz, Inc., 253 F.3d 337, 342 (8th Cir. 2001)*; [*28] *Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 262-63 (2d Cir. 2000)*; *Perry v. Woodward, 199 F.3d 1126, 1133 (10th Cir. 1999)*; *Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999)*; *Fadeyi v. Planned Parenthood Ass'n, 160 F.3d 1048, 1051-52 (5th Cir. 1998)*; *cf. Haddle v. Garrison, 525 U.S. 121, 126, 142 L. Ed. 2d 502, 119 S. Ct. 489 (1998)* (concluding that an at-will employee may sue under *42 U.S.C. § 1985(2)* for tortious interference with employment relationships). One of the most thoughtful and complete explanations applying Illinois law appears in *Riad v. 520 South Michigan Avenue Associates, 78 F. Supp. 2d 748, 754-57 (N.D. Ill. 1999)*. This court wholly agrees with and adopts that analysis. Suffice it to say that [HN19] Illinois law does not permit the termination of an at-will employee for a reason that violates public policy. *Palmateer v. Int'l Harvester Co., 85 Ill. 2d 124, 421 N.E.2d 876, 878, 52 Ill. Dec. 13 (Ill. 1981)*. [HN20] Jackson's at-will employment status does not bar his *section 1981* discriminatory termination claim.

[*29] The defendants note that the same standards which govern liability under Title VII also apply to *section 1981* claims and therefore reassert their Count I arguments as to each claim under Count III. For the reasons outlined above, these arguments are once again rejected.

Defendants McCormick and Pressler argue that judgment must be entered in their favor on the termination claim because Zero alone had the authority to fire Jackson. They claim that their participation in the decision was limited to recommending Jackson's termination five months before it happened. (Rule 56.1(a)(3) Statement PP 92, 93, 109, 110.) It is true that [HN21] "personal liability under *section 1981* must be predicated on the actor's personal involvement." *Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991)*. However, "the element of personal involvement may be satisfied by proof that a supervisor had knowledge of the alleged acts of discrimination and failed to remedy or prevent them." *Amin v. Quad/Graphics, Inc., 929 F. Supp. 73, 78 (N.D.N.Y. 1996)*. Here, Jackson produces evidence to show that both McCormick and Pressler held supervisory positions and were present when [*30] Zero stated that he was going to "get rid of that nigger," referring to Jackson. (Pl.'s Ex. 6, P 8.) The court has already rejected Local 705's objection to this evidence, which, if believed, is sufficient to establish McCormick's and Pressler's personal liability for Jackson's termination. *See Amin, 929 F. Supp. at 78-79* (holding that "evidence that defendants . . . possessed the requisite knowledge and failed to act in response" defeated their summary judgment motion); *see also Smith v. Rowe, 761 F.2d 360, 369 (7th Cir. 1985)* (supervisor's knowledge and failure to take any preventive action constituted sufficient personal involvement to support personal liability under section 1983).

Next, Pressler argues that there is insufficient evidence to support the racial harassment claim against her. Statute of limitations and evidentiary objections aside, the court agrees that Pressler's single racist remark overheard by Jackson, which was not directed toward him, is inadequate to create a genuine question of fact and therefore enters judgment in her favor on this claim. That she may have used the word "nigger" out of Jackson's presence is of little relevance. [*31] Pressler makes the same argument with respect to Jackson's retaliation claim. Jackson does not respond to this argument and the court sees no record evidence of Pressler's participation in the retaliation, so Pressler's motion for summary judgment on this claim is granted.

C. Counts IV and VII: Defamation Claims Against All Defendants

Local 705 argues that this court cannot exercise supplemental jurisdiction over Jackson's defamation (Count IV) and derivative respondeat superior (Count VII) claims because they do not derive from the same nucleus of operative fact as his federal claims. [HN22] District courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *28 U.S.C. § 1367(a)*. "The state and federal claims must derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs, 383 U.S. 715, 725, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*. "A loose factual connection between the claims is generally sufficient." *Ammerman v. Sween, 54 F.3d 423, 424 (7th Cir. 1995)*.

Jackson alleges [*32] [HN23] two types of *per se* defamation: (1) "words which impute inability to perform or want of integrity in the discharge of duties of office or employment"; and (2) "words which prejudice a particular party in his profession." *Pease v. Int'l Union of Operating Eng'rs Local 150, 208 Ill. App. 3d 863, 567 N.E.2d 614, 618-19, 153 Ill. Dec. 656 (Ill. App. Ct. 1991)*. The only statements mentioned in the complaint that appear to fall into these categories are accusations of financial malpractice and expense account irregularities. (Compl. PP 47, 48.) After Local 705 raised statute of limitations problems with respect to these statements, Jackson shifted the focus of his defamation claim to post-termination statements by Zero and McCormick that Jackson is not really a man of the cloth.

Local 705 asserts that there is no factual nexus between these statements and Jackson's federal claims. This assertion is false. In his deposition, Jackson claimed that Zero and McCormick told Joint Council members that Jackson was not a minister on March 14, 1995. (Defs.' Ex. J, at 525:4-6.) As described above, Hogan's affidavit alleging that Zero's and McCormick's opposition to Jackson was [*33] critical in preventing conversion of the chaplaincy into a full-time, paid position also centers on the events of March 14, 1995. A jury could reasonably infer that the allegedly defamatory statements played a role in causing the putative adverse employment action. The common nucleus of operative fact for Jackson's defamation and retaliation claims is Zero's and McCormick's statements to the Joint Council on March 14, 1995.

The real problem for Jackson on this defamation theory is the statute of limitations. Jackson filed his first

amended complaint adding a defamation count on May 15, 1996. [HN24] Illinois law provides a one-year statute of limitations for defamation actions. *735 ILCS 5/13-201*. Thus, statements made in March of 1995 cannot form the basis of a timely defamation claim. Jackson's testimony that Zero told "certain persons" that Jackson was not a minister is insufficient to support a timely claim because the date is not specified. *See Colucci v. Chicago Crime Comm'n, 31 Ill. App. 3d 802, 334 N.E.2d 461, 466 (Ill. App. Ct. 1975)* (where statute of limitations is involved, plaintiff must prove that statements were made on a precise date). To the extent Jackson's [*34] defamation claim is grounded in these statements, judgment in favor of the defendants is entered.

Jackson also alleges that Zero admitted in his deposition that he continues to tell people that Jackson is not a minister, but such an admission does not appear in the testimony Jackson cites. (Defs.' Ex. J, at 53:16 to 56:16.) In addition, Jackson cannot rely on statements made by Zero during his deposition because these statements were relevant to the proceedings and are therefore absolutely privileged under Illinois law. *See Defend v. Lascelles, 149 Ill. App. 3d 630, 500 N.E.2d 712, 718, 102 Ill. Dec. 819 (Ill. App. Ct. 1986)*. This court enters judgment in favor of defendants on these two defamation sub-claims.

Jackson points to additional defamatory statements, but there is no common date, audience, or any other factual link between these statements and the failure of Joint Council 25 to turn Jackson's chaplaincy into a full-time, paid position. Without such a common nucleus of operative fact, the court is without jurisdiction to entertain this state law claim. Pat Matarrese, head of the Local 705 retirees group, asserts that McCormick told him on at least three [*35] occasions on or after May 17, 1995 that Jackson was not a reverend or minister. (Pl.'s Ex. 24, PP 12, 13. [7]) Even assuming that a defamation claim based on these statements would be timely, *but cf. Colucci, 334 N.E.2d at 466* [HN25] (where statute of limitations is involved, alleging publication "on or about" or "subsequent to" a specific date, without accompanying details or information, is not enough), Jackson does not suggest that Matarrese was in a position to affect Joint Council 25's decision on the planned raise and promotion. Jackson's defamation claim grounded in these statements is dismissed for lack of jurisdiction. To the extent defamation is the foundation for Jackson's respondeat superior claims (Count VII), those claims are dismissed or judgment is entered in favor of Local 705, as appropriate.

    [7] In light of the court's disposition, *see infra*, Local 705's objection to paragraph 13 is denied as moot.

C. Counts VI and VII: Assault Claims Against All Defendants [8]

    [8] For ease of exposition, the court will discuss Jackson's IIED claim (Count V) later. *See infra* Section II(D).

[*36] The two alleged instances of assault took place on January 28, 1995 and March 14, 1995. Local 705 contends that neither assault claim shares a common nucleus of fact with Jackson's federal claims and that this court therefore lacks jurisdiction over the assault claims. As noted above, Zero's and McCormick's behavior at the March 14, 1995 Joint Council meeting is near the core of Jackson's federal retaliation claim. According to Jackson, the very same statements and threats constituted assault. This court clearly has supplemental jurisdiction over the assault claim arising from the Joint Council meeting. In proving that Jackson's "fear of imminent peril" on March 14 was "well-founded," *Parrish v. Donahue, 110 Ill. App. 3d 1081, 443 N.E.2d 786, 788, 66 Ill. Dec. 860 (Ill. App. Ct. 1982)*, he will almost certainly want to introduce evidence relating to defendants' previous threatening behavior toward him. By similar token, the hostility shown by the defendants toward Jackson on January 28 may help substantiate his claim that the opposition expressed to the Joint Council on March 14 was so intense as to effectively thwart Hogan's plan to turn the chaplaincy into a full-time, [*37] paid position. Causation here is essential to Jackson's federal retaliation claim. This is an admittedly loose nexus of fact, but it suffices to establish supplemental jurisdiction over the January 28 assault as well.

Local 705 next attacks Jackson's assault claims on the merits, arguing that he has failed to produce enough evidence to support a critical element of these claims. [HN26] Illinois law defines a civil assault as "an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *443 N.E.2d at 788*. Local 705 asserts that "mere words do not create a well-founded fear of

imminent peril." (Local 705 Mem. at 73.) However, at least one of the sources cited by Local 705 to support this assertion directly contradicts it:

> Even apart from such cases where the words indicate the intent of an act, there may be other situations in which the words themselves, without any accompanying gesture, are sufficient under the circumstances to arouse a reasonable apprehension of imminent bodily contact. Words [*38] are never spoken in a vacuum, and they cannot be utterly divorced from past conduct, or from the accompanying circumstances.

*Restatement (Second) of Torts § 31, cmt. d*; *see also Merheb v. Illinois State Toll Highway Auth., 267 F.3d 710, 714 (7th Cir. 2001)* ("An assault requires words, *ordinarily* accompanied by a menacing gesture (such as pointing a gun at the plaintiff), that make the plaintiff fear an imminent attack.") (emphasis added); *People v. Floyd, 278 Ill. App. 3d 568, 663 N.E.2d 74, 76, 215 Ill. Dec. 324 (Ill. App. Ct. 1996)* ("In Illinois, we have held that words alone are not *usually* enough to constitute an assault.") (emphasis added). [9] [HN27] Words alone can sometimes suffice, even without an accompanying threatening gesture. *See People v. Rynberk, 92 Ill. App. 3d 112, 415 N.E.2d 1087, 1090, 47 Ill. Dec. 774 (Ill. App. Ct. 1980)* (discussed *infra*).

> 9   Local 705 avoids the critical word "usually" by quoting instead another court's mischaracterization of *Floyd* as "noting that words alone are not enough to constitute assault." *Merheb v. Illinois State Toll Highway Auth., 2000 U.S. Dist. LEXIS 1667*, at *39, No. 98 C 3190 (N.D. Ill. Feb. 10, 2000). Counsel for Local 705 either did not read *Floyd* or intentionally tried to conceal what the case actually said about the relevant point of law. In any event, *Merheb* is distinguishable because the threat of violence there was not even made directly to the claimaint. *Id.* at *8-9, *38-39.

[*39] The critical question is whether the totality of the admissible evidence--words, past conduct, and surrounding circumstances--can support "a well-founded fear of imminent peril" during each alleged instance of assault. Jackson withdraws his assault claim against Pressler so the focus is on Zero and McCormick. In his deposition, Jackson stated that on January 28, 1995, while he was protesting outside the Local 705 hall, Zero "came out of the union hall and told me if I put that megaphone to my mouth one more time, what he was going to do to my 'black ass' and everything." (Defs.' Ex. J., at 448:13-16.) "He told me if I stick my mouth up to that horn again, he was going to ram it down my so-and-so throat." (*Id.* at 451:6-8.) At the same time, Zero also said that he should have a "necktie" (i.e., lynching) party for Jackson. (*Id.* at 555:20 to 556:3.) It is undisputed that Jackson was fearful that Zero would follow through on the threat to cram the megaphone down his throat. (Rule 56.1(b)(3) Statement P 341.) During this exchange, McCormick was 15 to 20 feet away and laughed. In this instance, laughing could not have generated a reasonable fear of imminent peril from McCormick [*40] or have suggested that he and Zero were acting in concert, [10] so he is entitled to judgment in his favor on this claim.

> 10   A known assassin's sinister cackle moments after making an explicit murder threat would be a different story. *See Restatement (Second) of Torts § 31, illus. 4*.

With respect to Zero, there is additional evidence that bears on the objective reasonableness of Jackson's fears. Zero and McCormick carried around a picture of a black man's hanging, which Jackson found to be threatening. (*Id. P 343.*) When Zero showed Jackson a picture with a black person being hung and said "if all of them was like that, they wouldn't have to go back to Africa," Jackson considered the combination of words and actions as a threat. (*Id. P 344.*) Jackson also considered personally threatening Zero's and McCormick's statements concerning the Emmett Till case that if they shot or hung black men they wouldn't be whistling at white women. (*Id. P 345.*) In addition to these directly threatening actions and [*41] statements, Jackson claims that Zero regularly made derogatory comments to African-Americans. (Rule 56.1(a)(3) Statement P 120.) Jackson was 65 years old at the time, is 5 feet 7 inches tall, and weighs 195 pounds; Zero is over 6 feet tall and weighs over 250 pounds. [11] (Rule 56.1(b)(3) Statement P 351, 352.)

> 11   Other evidence proffered by Jackson on this point is inadmissible. At one point in his deposition, Jackson suggested that Zero had

threatened to kill him, but offered no details as to date or time. (Ex. J, at 230:22 to 231:1.) The court grants Local 705's motion to strike this testimony. Without establishing that this alleged threat occurred prior to January 28, 1995 or March 14, 1995, it has no relevance on Jackson's assault claims. Because it is similarly irrelevant, the court strikes the portion of Jackson's deposition transcript discussing his fear and discomfort with having Zero in attendance. (*Id.* at 229:10 to 239:23.)

Against this backdrop, a jury could reasonably conclude that Jackson had [*42] a well-founded fear of imminent harm. This case is not too far removed from *People v. Rynberk, 415 N.E.2d at 1090*, where a six-foot, 240-pound male defendant advanced to within a foot of the victim and threatened to "beat her head in," which caused her to believe he was going to strike her, especially in light of her prior involvement in litigation against him. The Illinois Appellate Court affirmed the defendant's conviction for assault. On the relevant element, the distinction between criminal and civil assault is not substantial. *Compare 720 ILCS 5/12-1* ("reasonable apprehension of receiving a battery"), *with Parrish, 443 N.E.2d at 788* ("well-founded fear of imminent peril"). As in *Rynberk*, here the aggressor's only movement was to approach the victim, the aggressor was physically dominant, the verbal threat was direct, there was a history of conflict, and the victim believed that the aggressor would actually carry out the threat. Granted, the victim in *Rynberk* was a woman in a wheelchair, but there was no evidence that the defendant had previously made direct threats to her. In contrast, Zero's prior threatening statements could reasonably [*43] contribute to Jackson's fears. Although the absence of any evidence that Zero took concrete steps toward carrying through on his threat makes it a close question, the court finds that Jackson has established a genuine issue of material fact as to the reasonableness of his apprehension on January 28, 1995.

The March assault claim is stronger. At the Joint Council meeting, Zero threatened to throw Jackson's "black ass through the window," and Jackson feared that he would make good on the threat. (Rule 56.1(b)(3) Statement PP 303, 340.) An additional factor supporting the reasonableness of this fear is Zero's threatening behavior on January 28. Also, Dennis McNamara, a witness to the incident, has averred that Zero was very angry when he made the threat, that based on his observation of Zero's statements and physical state that he would make good on the threat, and that he was concerned for Jackson's safety. (*Id.* PP 335, 336, 338, 339.) Summary judgment in favor of Zero on this claim is denied. On the other hand, Jackson could not even recall in his deposition whether McCormick was present at the meeting. (Pl.'s Ex. 1, at 461:2-7.) There is no evidence that McCormick assisted in [*44] Zero's assault or that Jackson feared an imminent attack from McCormick. Judgment is entered in favor of McCormick.

Local 705 contends that it cannot be held vicariously liable for Zero's alleged assaults. The theory is that Zero was not acting within the scope of his employment or in furtherance of his employer's interests. *See Rubin v. Yellow Cab Co., 154 Ill. App. 3d 336, 507 N.E.2d 114, 115, 107 Ill. Dec. 450 (Ill. App. Ct. 1987)*. Although it is a close question, the argument fails. [HN28] "Under Illinois law, the conduct of a servant is within the scope of employment if, but only if: (1) it is of the kind he is employed to perform; (2) it occurs substantially within the authorized time and space limits; and (3) it is actuated, at least in part, by a purpose to serve the master." *Duffy v. United States, 966 F.2d 307, 314 (7th Cir. 1992)*. First, as a high officer of Local 705, it is reasonable to suppose that Zero had authority to maintain its reputation. Asking a former employee to refrain from demonstrating publicly outside the union hall is the type of thing one might expect from a union leader. The evidence strongly suggests that Zero had authority [*45] over the union hall itself, so it was entirely foreseeable that he might ask an individual to leave the premises. Second, both alleged assaults occurred in or near the Local 705 hall. Finally, it is plausible to think that stopping a public display of disapproval and excluding a disgruntled former employee from the union hall would serve Local 705's interests.

The fact that Zero's actions may have escalated beyond the bounds of what could reasonably serve Local 705's interests does not foreclose the possibility of vicarious liability. *See Metzler v. Layton, 373 Ill. 88, 25 N.E.2d 60, 62 (Ill. 1939)* [HN29] ("The master is liable for any such act of the servant which, if isolated, would not be imputable to the master, but which is so connected with and immediately grows out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, takes its color and quality from the

earlier act.") (quoting *Gulf, Colorado & Sante Fe Ry. Co. v. Cobb, 45 S.W.2d 323, 325 (Tex. Ct. Civ. App. 1931)).* Illinois courts have held that the employer may be liable where the employee acts [*46] with the dual purpose of furthering the employer's interests and venting personal anger. *Gregor v. Kleiser, 111 Ill. App. 3d 333, 443 N.E.2d 1162, 1166, 67 Ill. Dec. 38 (Ill. App. Ct. 1982).* "It is sufficient if [the employee's] actions were prompted only in part by a purpose to protect [the employer's] property or further the employer's business." *Bryant v. Livigni, 250 Ill. App. 3d 303, 619 N.E.2d 550, 559, 188 Ill. Dec. 925 (Ill. App. Ct. 1993).* Local 705's motion for summary judgment on the respondeat superior assault claims is denied.

D. Counts V and VII: Intentional Infliction of Emotional Distress Claims Against All Defendants

Local 705 argues that Jackson's intentional infliction of emotional distress claim is preempted by the Illinois Human Rights Act (the "IHRA"), *775 ILCS 5/8-111(C).* 12 [HN30] Whether a common law claim is so displaced "depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis, 177 Ill. 2d 511, 687 N.E.2d 21, 23, 227 Ill. Dec. 98 (Ill. 1997).* Contrary to the [*47] position taken by Local 705 and some courts in this district, 13 it does not matter that the conduct giving rise to the tort claim could also support an IHRA claim. The IHRA was not intended to preempt all tort claims arising out of actions it prohibits. *Id. 687 N.E.2d at 24.* Rather, the critical question is whether the plaintiff can "establish the necessary elements of the tort independent of any *legal duties* created by the [IHRA]." *Id.* (emphasis added); accord *Luttrell v. O'Connor Chevrolet, Inc., 2001 U.S. Dist. LEXIS 14651*, at *7-8, No. 01 C 979 (N.D. Ill. Sept. 18, 2001).

> 12  In its reply brief, Local 705 for the first time attempts to expand this argument to include Jackson's other state law claims. This attempted expansion arguably comes too late. *See Wilson v. O'Leary, 895 F.2d 378, 384 (7th Cir. 1990)* [HN31] (argument not raised until reply brief is waived). But even if this argument goes to subject matter jurisdiction, the court would reject it with respect to the assault claims as well. *See Maksimovic v. Tsogalis, 177 Ill. 2d 511, 687 N.E.2d 21, 22, 227 Ill. Dec. 98 (Ill. 1997)* [HN32] (holding that common law assault claim was not preempted by the IHRA).

[*48]
> 13  See, e.g., *Averhart v. Cook County Corr. Dep't, 2002 U.S. Dist. LEXIS 1414*, at *12, No. 01 C 5569, (D. Ill. Jan. 28, 2002) (holding IIED claim preempted by the IHRA because "that claim is based on the same acts that form the basis of plaintiff's racial harassment and retaliation claims"); *Haywood v. Lucent Techs. Inc., 169 F. Supp. 2d 890, 914 (N.D. Ill. 2001)* ("[Plaintiff] concedes that her IIED claim is based on the same conduct underlying her discrimination claim; therefore, her IIED claim clearly is 'inextricably linked' to her federal claims, and it is preempted by the IHRA.").

[HN33] In Illinois, a plaintiff establishes a claim for intentional infliction of emotional distress by showing that: (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and (3) the conduct in fact caused severe emotional distress. *McGrath v. Fahey, 126 Ill. 2d 78, 533 N.E.2d 806, 809, 127 Ill. Dec. 724 (Ill. 1988).* [*49] "The extreme and outrageous character of the conduct can arise from the abuse of a position of power." *Doe v. Calumet City, 161 Ill. 2d 374, 641 N.E.2d 498, 507, 204 Ill. Dec. 274 (Ill. 1994).* An employer's abuse of authority over an employer can qualify. *Milton v. Illinois Bell Tel. Co., 101 Ill. App. 3d 75, 427 N.E.2d 829, 832, 56 Ill. Dec. 497 (Ill. App. Ct. 1981); see also Pavilon v. Kaferly, 204 Ill. App. 3d 235, 561 N.E.2d 1245, 1251, 149 Ill. Dec. 549 (Ill. App. Ct. 1990)* (finding sexual harassment by employer to be extreme and outrageous). The particular sensitivity of the plaintiff is also a relevant factor. *See McGrath, 533 N.E.2d at 811* ("Behavior which (though rude, abrasive or extremely inconsiderate) may not otherwise be actionable may be deemed outrageous if the defendant knows that the plaintiff is peculiarly susceptible to emotional distress.").

If Jackson can show that the alleged conduct is extreme and outrageous (more on that later), it will be because it was a racist and sometimes threatening abuse of supervisory power directed toward an individual known by all to be especially sensitive to this [*50] type of conduct, not because it may also have violated the IHRA. *See generally Benitez v. KFC Nat'l Mgmt. Co.,*

305 Ill. App. 3d 1027, 714 N.E.2d 1002, 1009, 239 Ill. Dec. 705 (Ill. App. Ct. 1999) [HN34] ("Since the elements of [IIED] are quite different from those necessary to establish a civil rights violation under the [IHRA], the [IHRA] does not preempt such a cause of action.") (internal quotation marks and citations omitted). Repeatedly calling a black employee a "nigger" was offensive long before the Illinois legislature banned racial harassment in the workplace. *Cf. Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)* ("Perhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates.") (citation omitted); *Pavilon, 561 N.E.2d at 1251* (finding sexual harassment by employer to be "extreme and outrageous"). But even if racist comments of this type were not considered outrageous before the passage of the IHRA, Jackson's IIED claim still would survive. [*51] A jury could reasonably conclude that Zero's implied and direct threats of physical harm were extreme and outrageous quite apart from their racial content. *Cf. Krocka v. City of Chicago, 203 F.3d 507, 517 (7th Cir. 2000)* (finding IIED claim preempted by IHRA because comments "were only offensive to the extent that they referred to [plaintiff]'s disability").

Next, Local 705 attacks the IIED claim on its merits, arguing that the alleged conduct was not "truly extreme and outrageous." In support of this argument, Local 705 offers two erroneous propositions of law. First, Local 705 asserts that there is a heightened standard of outrageousness in the employment context. One of the cases cited by Local 705 directly contradicts this assertion, at least with respect to a superior's conduct. In *Piech v. Arthur Andersen & Co., 841 F. Supp. 825, 831 (N.D. Ill. 1994)*, the court, citing *McGrath*, recognized that [HN35] "when, as here, the defendant has some degree of power over the plaintiff, the severity of the conduct that plaintiff need allege decreases as the defendant's level of control increases." Most of the other cases cited by Local 705 merely recognize [*52] that conflicts in the workplace are inevitable and that most do not rise to the level of "extreme and outrageous." *See Oates v. Discovery Zone, 116 F.3d 1161, 1174 (7th Cir. 1997)* [14]; *Harris v. First Fed. Sav. & Loan Ass'n, 129 Ill. App. 3d 978, 473 N.E.2d 457, 459, 85 Ill. Dec. 89 (Ill. App. Ct. 1984)*; *Heying v. Simonaitis, 126 Ill. App. 3d 157, 466 N.E.2d 1137, 1144, 81 Ill. Dec. 335 (Ill. App. Ct. 1984)*. The only case cited by Local 705 that provides any support for a higher standard is *Pudil v. Smart Buy, Inc., 607 F. Supp. 440, 444 (N.D. Ill. 1985)*. However, the *Pudil* decision preceded *McGrath* and *Doe*, in which the Illinois Supreme Court made clear that a power disparity, like an employer-employee relationship, *lowers* the required level of outrageousness. *See Doe, 641 N.E.2d at 507*; *McGrath, 533 N.E.2d at 810*.

> 14  The court once again feels compelled to comment on Local 705's questionable use of precedent. Local 705 quotes the following language from *Oates*: "the circumstances surrounding a typical employment dispute usually do not rise to the level of extreme and outrageous conduct." (Local 705 Mem. at 67.) How this statement supports the proposition that a higher standard applies in the employment context is a mystery. But this error in logic is forgivable. What is less easily forgiven stems from Local 705's omission of the word "accordingly" from the beginning of the quoted sentence. *Oates, 116 F.3d at 1174*. The preceding sentence states the general standard for outrageousness. *Id*. In context, it is clear that the Seventh Circuit applied the general standard, *not* a higher one.

[*53] Local 705's second erroneous legal argument is that, as a matter of law, racial slurs fail to rise to the level of truly extreme and outrageous conduct. The cases relied upon by Local 705 do not support this position. In *Irving v. J.L. Marsh, Inc., 46 Ill. App. 3d 162, 360 N.E.2d 983, 985-86, 4 Ill. Dec. 720 (Ill. App. Ct. 1977)*, the court, in what it described as a "difficult issue" to resolve, held that a store clerk's isolated act of writing "arrogant nigger" on a return slip was not sufficiently outrageous to support an IIED claim. The *Irving* court did not suggest that multiple racial slurs could never qualify. Nor did the court in *Briggs v. N. Shore Sanitary Dist., 914 F. Supp. 245, 252 (N.D. Ill. 1996)*, make any such sweeping generalization. But whatever the *Irving* and *Briggs* courts may have said, a categorical approach of the kind urged by Local 705 cannot be reconciled with the Illinois Supreme Court's clear statement that [HN36] "the outrageousness of a defendant's conduct must be determined in view of all the facts and circumstances pleaded and proved in a particular case." *McGrath, 533 N.E.2d at 811*.

[HN37] The question [*54] is "whether the distress inflicted is so severe that no reasonable man could be

expected to endure it." *McGrath, 533 N.E.2d at 809* (quoting *Restatement (Second) of Torts § 46, cmt. j* (1965)). Jackson claims to have heard Zero and McCormick use the word "nigger" and other racially derogatory terms on several occasions. (Rule 56.1(a)(3) Statement PP 120-136.) It is undisputed for summary judgment purposes that Zero and McCormick talked about lynching (or having "necktie parties" for) Jackson. (Rule 56.1(b)(3) Statement PP 16, 17.) And, as noted above, a jury could reasonably conclude on the evidence presented that Zero's behavior on two occasions was so extreme as to constitute assault. The threat of physical harm distinguishes this case from those in which racial slurs have been held insufficient to support an IIED claim. *Cf. Harris, 473 N.E.2d at 459*. Other factors weighing in favor of outrageousness here also include the abuse of supervisory authority, the duration of the offensive conduct, and Jackson's special sensitivity to racial threats as an older black man. This is much more than a typical employment dispute or even an average case of [*55] racial harassment. Jackson's evidence goes well beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *McGrath, 533 N.E.2d at 809* (quoting *Restatement (Second) of Torts § 46, cmt. d*). The court cannot conclude as a matter of law that a reasonable man could be expected to endure the defendants' conduct.

Local 705 argues that it cannot be held vicariously liable on the IIED claim because the individual defendants were not acting in furtherance of Local 705's interests. To the extent that the IIED claim rests on the same conduct that underlies the assault claims, the court rejects Local 705's argument for the reasons outlined above. The other instances of racial harassment arguably stand on a different footing. Under current Illinois law, an employer can be vicariously liable for the tortious conduct of his employee only if the employee was acting within the scope of his employment. [15] *Wright v. City of Danville, 174 Ill. 2d 391, 675 N.E.2d 110, 118, 221 Ill. Dec. 203 (Ill. 1996)*. This, in turn, requires that the employee's conduct be "actuated, at least in part, by a purpose to serve the master." *Duffy, 966 F.2d at 314.* [*56] As the Seventh Circuit has observed, [HN38] "it would be the rare case where racial harassment against a co-worker could be thought by the author of the harassment to help the employer's business." *Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1422 (7th Cir. 1986)*. The question for Local 705 becomes whether Jackson's IIED claim can stand on the two instances of assault. This court believes that it can. In the course of the first assault, Zero not only threatened to ram a megaphone down Jackson's throat, but used the phrase "black ass" and also threatened to lynch him. These statements were made in front of numerous witnesses, two of whom laughed. A jury could reasonably find that this assault alone was an affront no reasonable man could be expected to endure.

> 15 The *Restatement (Second) of Agency* recognizes that [HN39] a principal also may be liable for "the torts of his servants acting outside the scope of their employment [if the servant] was aided in accomplishing the tort by the existence of the agency relation." *Id.* § 219(2)(d). For Title VII purposes, the fact that harassment by a supervisor culminated in a tangible employment action raises a nonrebuttable presumption that the employment relationship aided the harassment. *Faragher, 524 U.S. at 807*. No Illinois case cites this subsection of the *Restatement*, and, as far as this court is aware, no Illinois case applies this theory of vicarious liability.

[*57] Defendant Pressler argues that no record evidence shows that she intentionally caused Jackson any severe emotional distress. Jackson's evidence against Pressler consists, at most, [16] of the following: (1) she told another person that African-Americans had small brains, were dumb, and had less knowledge that white people; (2) she constantly used the word "nigger"; (3) on January 28, 1995, she laughed while Jackson was being assaulted by Zero; (4) she sent a memorandum to Zero and McCormick advising them to refrain from using racially derogatory terms and to put a token black person on their slate; and (5) she filed a "bogus" defamation suit against Jackson. The court agrees that this evidence is insufficient to make out an IIED claim against Pressler. Pressler did not make the first statement to Jackson or send him the memorandum, and there is no evidence that she ever used the word "nigger" in the presence of any black person. (Pl.'s Ex. 8, P 9.) The filing of a frivolous lawsuit is not "truly extreme or outrageous" where the suit is voluntarily dismissed a month-and-a-half later. Similarly, her laughter during the January assault, while rude and insensitive, was not outrageous. [*58] And even if the combination of these events was outrageous, there is insufficient evidence to support an inference that Pressler intended them to inflict severe emotional distress or knew that there was a high probability that her actions

would inflict such distress. The court therefore enters summary judgment the IIED claim in favor of Pressler.

> 16   In light of the court's holding, *see infra*, Local 705's motion to strike material relevant to this claim is denied as moot.

### E. Mitigation of Damages

[HN40] Under Title VII and *section 1981*, a defendant can show that the plaintiff failed to mitigate damages by demonstrating that "the plaintiff was not reasonably diligent in seeking other employment and that there was a reasonable chance that plaintiff might have found a comparable position." *Sheehan v. Donlen Corp., 173 F.3d 1039, 1049 (7th Cir. 1999)* (Title VII); *accord Hunter, 797 F.2d at 1427* (*section 1981*). According to the defendants, the undisputed facts show both that [*59] Jackson was not reasonably diligent and that there was a reasonable chance of comparable employment. Jackson argues that the defendants waived this affirmative defense by not pleading it and, in any event, fail to establish the elements of the defense. Whether or not the defense has been waived (and there is good reason to think it has not been, see *Behr v. Drake Hotel, Inc.*, No. 82 C 5551, *1986 U.S. Dist. LEXIS 18990* (N.D. Ill. Oct. 20, 1986)), the defendants have failed to show as a matter of law that Jackson had a reasonable chance of finding a comparable position. The only relevant record evidence is that 20 union representative positions and 49 union organizer positions were filled at another Chicago labor union between September 1, 1994 and May 1, 2001. (Rule 56.1(a)(3) Statement P 195.) The defendants offer no evidence to show that Jackson had a reasonable chance of being hired for any of these positions. As is generally true, [HN41] "the issue of mitigation is a question of fact for the jury." *Smith v. Great Am. Rests., 969 F.2d 430, 438 (7th Cir. 1992)*.

### III. Conclusion

Perhaps the best way to summarize the court's holding is simply to [*60] catalogue the claims that remain in the case. They are: (1) the Title VII claims against Local 705 for unlawful termination, racial harassment, and retaliation; (2) the parallel *section 1981* claims against all four defendants, except for the racial harassment and retaliation claims against Pressler, on which summary judgment is entered in her favor; (3) the assault claims against Zero and Local 705; and (4) the IIED claims against Zero, McCormick, and Local 705.

ENTER:

JOAN B. GOTTSCHALL

United States District Judge

DATED: March 22, 2002